**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

AMY D.,

           Plaintiff,

  v.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

           Defendant.

Case No. 21 C 1646

Magistrate Judge Sunil R. Harjani

## MEMORANDUM OPINION AND ORDER

Plaintiff Amy D. seeks review of the final decision of the Acting Commissioner of Social Security denying her claim for Disability Insurance Benefits ("DIB"). Amy requests reversal of the ALJ's decision and remand [19], and the Acting Commissioner moves for summary judgment affirming the decision [27]. For the following reasons, the Court affirms the ALJ's decision.

## BACKGROUND

Born on November 24, 1973, Amy was 42 years old when she applied for DIB on February 20, 2015. Amy alleges disability as of October 16, 2014 due to abdominal visceral pain, chronic bowel, Barrett's esophagus,[1] gastrointestinal reflux disease ("GERD"),[2] sphincterotomy, biliary stent placement, gallbladder removal, pancreatitis, acute duodenitis,[3] bipolar disorder, and attention deficit hyperactivity disorder. Amy obtained a college education and last worked in

---

[1] Barrett's esophagus is "a condition in which the cells of [the] lower esophagus become damaged, usually from repeated exposure to stomach acid." *Wleklinski v. Colvin*, 2013 WL 4506769, at *3 n.5 (N.D. Ill. Aug. 23, 2013) (citing www.mayoclinic.com/health/barretts-esophagus).

[2] GERD "is a chronic digestive disease." *Reyes v. Berryhill*, 2017 WL 3454493, at *5 n.3 (S.D. Ill. Aug. 11, 2017) (citing http://www.mayoclinic.org/diseases-conditions/gerd/basics/definition/con-20025201).

[3] Duodenitis is inflammation in the first part of the small intestine. *Jackie L. H. v. Saul*, 2019 WL 4120752, at *5 n.7 (S.D. Ind. Aug. 14, 2019) (citing https://www.healthline.com/health/gastritis-duodenitis).

November 2016 as a nurse.[4]

Amy's claims were initially denied on August 6, 2015, upon reconsideration on February 24, 2016, and by hearing decision on November 30, 2017. (R. 1394). On January 26, 2018, Amy filed a request for review of the hearing decision, which was denied by the Appeals Council on February 1, 2019. *Id*. Amy then filed a complaint for judicial review by this Court where the parties agreed to remand the case. *Id*. On May 13, 2020, the administrative law judge ("ALJ") held a telephone hearing, which Amy and her attorney, Meredith Marcus, attended, and vocational expert ("VE") Michelle Peters Pagella provided testimony. *Id*. at 1435-75. Following the remand, the ALJ issued a decision on November 27, 2020, finding that Amy was not disabled. *Id*. at 1394-1422. The opinion followed the required five-step evaluation process. 20 C.F.R. § 404.1520.

The ALJ concluded that Amy had the following severe impairments: gastrointestinal impairments,[5] lumbar degenerative disc disease, cervical degenerative disc disease, obesity, anxiety, and depression. (R. 1398). The ALJ concluded that Amy does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. *Id*. at 1399. The ALJ considered Listing 1.04 for disorders of the spine, Listing 5.06 for gastrointestinal impairments, and Listing 12.04 for mental impairments. *Id*. at 1399-1400. Under the "paragraph B" analysis, the ALJ found that Amy had a mild limitation in the functional area of understanding, remembering or applying information, and moderate limitations in the remaining three functions areas, interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself. *Id*. at

---

[4] Although Amy worked after the alleged disability onset date, the ALJ concluded that the work activity did not rise to the level of substantial gainful activity. (R. 1397).

[5] Diagnosed as gastritis, GERD, irritable bowel syndrome ("IBS"), sphincter of Oddi dysfunction, and adenomatous polyp of the colon and sphincter. (R. 1398).

1400-01.  The ALJ then determined that Amy had the residual functional capacity ("RFC") to perform sedentary work as defined in 20 CFR 404.1567(a) with the following limitations:

> claimant can lift and carry 10 pounds occasionally and less than 10 pounds frequently and push and pull as much as she can lift and carry. The claimant can operate foot controls occasionally with the feet bilaterally. The claimant can operate hand controls with [sic] frequently with the hands bilaterally. The claimant can frequently handle, finger, feel as well as reach overhead and in all other directions with the upper extremities bilaterally. The claimant can occasionally stoop, kneel, crouch, crawl and climb ramps and stairs but never climb ladders, ropes or scaffolds. The claimant can never work at unprotected heights. The claimant can occasionally work in vibration, with moving mechanical parts and operate a motor vehicle. The claimant is able to understand, remember, carry out simple and routine tasks, perform simple work-related decisions and occasionally interact with supervisors, coworkers and the general public.

*Id*. at 1402.  The ALJ concluded that Amy is unable to perform any past relevant work, but based on the VE's testimony, other jobs existed in significant numbers in the national economy that she could perform, including sorter, bench packer, and inspector. *Id*. at 1420-22.  As a result, the ALJ found Amy not disabled. *Id*. at 1422.

## **DISCUSSION**

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  To determine whether a claimant is disabled, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals any of the listings found in the regulations, *see* 20 C.F.R. § 404, Subpt. P, App. 1 (2004); (4) whether the claimant is unable to perform his former occupation; and (5) whether the claimant is unable to perform any other available work in light of his age, education, and work experience. 20 C.F.R. § 404.1520(a)(4); *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir.

3

2000). These steps are to be performed sequentially. 20 C.F.R. § 404.1520(a)(4). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford*, 227 F.3d at 868 (internal quotation marks omitted).

Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon a legal error. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla" and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, --- U.S. ----, 139 S.Ct. 1148, 1154 (2019) (internal quotation marks omitted). In reviewing an ALJ's decision, the Court "will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [its] judgment for the ALJ's determination." *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022) (internal quotation marks omitted). Nevertheless, where the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele*, 290 F.3d at 940.

Amy argues that the ALJ's decision should be reversed and remanded for four reasons. First, she contends that the ALJ's step three equivalency as to Listing 5.06 is flawed. Second, Amy asserts that the ALJ improperly discounted her subjective symptom allegations. Third, she disagrees with the ALJ's medical opinion analysis. Fourth, Amy argues that the ALJ and VE erred at step five. For the reasons discussed below, the Court finds the ALJ's decision is supported by substantial evidence. *Biestek*, 139 S. Ct. at 1154.

## A. Listing 5.06 Step Three Equivalency

Amy asserts that the ALJ's step three equivalency as to Listing 5.06 is flawed because her diagnoses of IBS and sphincter of Oddi dysfunction are medically equivalent to Listing 5.06, the

4

ALJ's analysis of her IBS and severe abdominal pain was perfunctory, and a state agency doctor should have reviewed listings under 5.00. At the same time, Amy acknowledges that "the Listing cannot be met." Doc. 19 at 10. The Court finds that the ALJ's determination that Amy did not meet a 5.06 Listing or equivalency is supported by substantial evidence.

A claimant is eligible for disability benefits if she has an impairment or combination of impairments that meet or equal an impairment found in the Listing of Impairments. A claimant bears the burden of proving that her condition meets or equals a listed impairment. *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). The claimant must show that her impairment met all of the required medical criteria. *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999). A condition that meets only some criteria, "no matter how severely," will not qualify as meeting a listing. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) *see also Garza v. Kijakazi*, 2022 WL 378663, at *2 (7th Cir. Feb. 8, 2022) ("A finding at step 3 that a claimant is per se disabled under a listed impairment is a very high bar"). Further, the ALJ should mention the specific listing and provide "more than a superficial analysis." *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004). Specifically, Listing 5.06 for inflammatory bowel disease requires fulfilling the requirement of subpart A or two requirements in subpart B. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 5.06.

In this case, the ALJ first identified Listing 5.06 by name. (R. 1399). Then, the ALJ explained why the medical evidence of Amy's numerous gastrointestinal impairments did not meet or equal the requirements of 5.06(A) because "there is no evidence of obstruction of stenoic [*sic*] areas in the small intestine of colon with proximal dilatation requiring hospitalization for intestinal decompression[.]" *Id*. The ALJ also detailed how Amy's gastrointestinal impairments did not meet or equal two of the six requirements of 5.06(B) either. *Id*. Although the ALJ did not mention Amy's hospitalizations, sphincterotomy, and medications in discussing Listing 5.06, "ALJs do not

5

have a duty to discuss every single piece of evidence." *Grove v. Kijakazi*, 2022 WL 1262131, at *2 (7th Cir. April 28, 2022). Rather, we "read the ALJ's decision as a whole." *Rice*, 384 F.3d at 370 n. 5; *see also Summers v. Colvin*, 634 F. App'x 590, 593 (7th Cir. 2016). Later in the ALJ's opinion, the ALJ addressed Amy's evidence more thoroughly and explained why the record did not establish the criteria required to satisfy Listing 5.06. For example, the ALJ acknowledged that the record showed Amy's complaints of abdominal pain but failed to support her allegations of severity and disabling symptoms. (R. 1406).

In addition, the state agency doctors reviewed many of Amy's gastrointestinal records to determine whether she had any medically determinable impairments related to "other disorders of [the] gastrointestinal system." *Id*. at 1496; *see also Knox v. Astrue*, 327 F. App'x 652, 655 (7th Cir. 2009) (affirming the ALJ's decision because "[t]wo state-agency physicians concluded that [claimant's] impairments did not meet or medically equal a listing, and there was no medical opinion to the contrary."); *Steward v. Bowen*, 858 F.2d 1295, 1298–99 (7th Cir. 1988) (affirming where doctors review claimant's records and "concluded that her impairments are not the medical equivalent of a listed impairment."). In the present case, a state doctor noted that Amy's colonoscopy was normal, gastroenteritis resolved, IBS stable, GERD controlled with medication, and complaints of abdominal pain. *Id*. at 1499. The ALJ pointed out that "no State Agency consultant or acceptable medical source designated to make an equivalency finding concluded that the claimant's impairment(s) medically equaled a listed impairment." *Id*. at 1402. Thus, the ALJ determined that Amy's impairments did not meet or equal a Listing with more than a perfunctory analysis, and no medical professional concluded otherwise in the record. Plaintiff's conclusory allegation that the evidence is equivalent to the standards for Listing 5.06 is not adequate to meet her burden that the Listing criteria was satisfied.

### B. Subjective Symptom Assessment

Amy's second argument is that the ALJ improperly disregarded her subjective symptoms. Amy's argument is unavailing because the ALJ did not evaluate Amy's pain based on objective evidence alone. Instead, she gave appropriate weight to Amy's subjective statements in conjunction with her objective medical evidence, course of treatment, drug-seeking behavior, and activities of daily living ("ADLs"). The Court discusses each in turn.

In evaluating a claimant's subjective symptom allegations, an ALJ must consider several factors, including the claimant's objective medical evidence; ADLs; location, duration, frequency, and intensity of their pain or other symptoms; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of medication; treatment and other measures besides medication taken to relieve pain or other symptoms; and functional limitations due to pain or other symptoms. 20 C.F.R. § 404.1529(c). "As long as an ALJ gives specific reasons supported by the record, [the Court] will not overturn a credibility determination unless it is patently wrong." *Grotts v. Kijakazi*, 27 F.4th 1273, 1279 (7th Cir. 2022); *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014) (patently wrong "means that the decision lacks any explanation or support."). Indeed, "[s]ubjective statements by claimants as to pain or other symptoms are not alone conclusive evidence of disability and must be supported by other objective evidence." *Id.* at 1278.

First, the ALJ relied on objective evidence to dispute Amy's characterization of her pain and psychiatric complaints. (R. 1406). "Although an ALJ may not ignore a claimant's subjective reports of pain simply because they are not fully supported by objective medical evidence, discrepancies between objective evidence and self-reports may suggest symptom exaggeration." *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008); *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005) ("But a discrepancy between the degree of pain claimed by the

applicant and that suggested by medical records is probative of exaggeration."); *Powers v. Apfel*, 207 F.3d 431, 435–36 (7th Cir. 2000) (same). In analyzing Amy's "pain log," the ALJ provided 48 record citations between December 2014 and June 2019 where Amy denied neck or back pain. *See, e.g.*, (R. 684, 788, 1133, 1929, 2567). The ALJ did not state that Amy had no pain, just that the extent of her allegations was out of sync with the medical evidence. *See Spies v. Colvin*, 641 F. App'x 628, 634 (7th Cir. 2016) ("the ALJ did not disbelieve that [plaintiff] was experiencing pain, but only that the diagnosed impairments she and her doctors identified as the source of her pain were not severe enough to disable her to the extent alleged."); *Mitze v. Colvin*, 782 F.3d 879, 881 (7th Cir. 2015) ("The judge had not denied that she has pain ... [b]ut he didn't believe that the pain was severe enough to disable her to the extent she claimed."). These records are not solely complaints of abdominal pain or unrelated treatment. Instead, they included a routine checkup, school-related physical, and surgical follow-up where the doctors' noted Amy denying back or neck pain or stating that she had a normal skeletal range of motion. (R. 2015, 2017, 2567). Moreover, the records the ALJ identified with no pain spanned the same period, 2016 to 2018, that Plaintiff asserts supports her back pain. Finally, contrary to Plaintiff's claim that the ALJ glossed over Amy's spinal surgery, the ALJ described Amy's MRI and treatment leading up to her surgery in 2017 and acknowledged Amy's testimony concerning her pain since her fusion surgery and that she regained her full range of motion. *Id*. at 1404, 1412. Thus, the ALJ evaluated the relevant evidence where Amy denied neck or back pain and explained her analysis in relation to that evidence.

In addition, the ALJ identified records where Amy was described as in "no significant distress," "comfortable," and in "no acute distress." (R. 1406). Several courts in this circuit have found that medical examination notes documenting "no acute distress" were relevant evidence in

evaluating the severity of the claimant's symptoms. *See, e.g., Echterling v. Berryhill*, 2019 WL 1397475, at *3 (N.D. Ind. March 27, 2019) (The ALJ could rely on examination findings of no acute distress as being inconsistent with a claimant's statements of severe pain.); *Garrett v. Berryhill*, 2017 WL 3521048, at *5 (N.D. Ill. August 15, 2017) (The ALJ rejected claimant's statements about severe pain by relying on medical records in which the doctor "observed that plaintiff was in 'no acute distress and exhibited normal lumbar spine range of motion' at a time when plaintiff stated his pain was 'killing him.'").  Here, the ALJ relied on records to contrast other records that noted Amy was in "slight distress," "distressed," "moderate acute distress," or "uncomfortable." (R. 1406).  The ALJ pointed out that six records stated variations of Amy being distressed, but sixty-seven records said she was not. *Id*.  Based on these numbers, the ALJ concluded that most of the records concluded that Amy was not distressed.  This was a proper use of records to identify inconsistent statements regarding Amy's subjective assessment of her pain. More importantly, the ALJ grappled with conflicting records and weighed them to reach a conclusion.  While the ALJ did not find Amy as limited as she would like, the Court cannot reweigh the evidence to get to where Plaintiff thinks the ALJ should have gone. *Poole v. Kijakazi*, 28 F.4th 792, 796 (7th Cir. 2022); *Grotts*, 27 F.4th at 1279; *Reynolds*, 25 F.4th at 473.  Even with this result, the ALJ limited Amy to sedentary work with numerous accommodations, such as lifting and carrying 10 pounds occasionally and less than 10 pounds frequently. *Id*. at 1402.  As such, the ALJ considered relevant evidence in evaluating Amy's subjective symptoms and formulating the RFC.

Regarding Amy's psychiatric complaints and mental functioning, the ALJ identified approximately 25 records between December 2014 and July 2019, where a medical professional noted that Amy denied depression, suicidal thoughts, or anxiety, her psychiatric affect or mood was normal, or negative was listed next to psychiatric/behavioral review of symptoms. *See, e.g.*,

(R. 685, 694, 886, 1100, 1118, 2541). Records also show that Amy told a psychotherapist in 2018 and 2019 that her "mood is great" and her mood and anxiety were "really good." *Id*. at 2436, 2659. The ALJ relied on Amy's testimony that she sees a psychiatrist who prescribes medication for depression and anxiety, her mental health treatment is sufficient, her medication helps "quite a bit," and she does not need to see a therapist. *Id*. at 1404. Contrary to Plaintiff's allegations that the ALJ ignored records of Amy's history of psychiatric diagnoses, *see* Doc. 19 at 12-13, the records that the ALJ identified also acknowledged Amy's past medical history, including bipolar, depression, or mood disorder diagnoses. (R. 684, 693, 851, 1099). Further, the ALJ concluded that Amy had severe mental health impairments, such as anxiety and depression. *Id*. at 1398. In the end, the ALJ identified discrepancies in various records where Amy denied psychiatric complaints, which may suggest symptom exaggeration. Even so, the ALJ included RFC accommodations for Amy's moderate limitations in interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself. Specifically, the ALJ limited Amy to understanding, remembering, carrying out simple and routine tasks, performing simple work-related decisions, and occasionally interacting with others. *Id.* at 1402. Again, it is not the Court's job to reweigh the evidence. *Poole*, 28 F.4th at 796; *Grotts*, 27 F.4th at 1279; *Reynolds*, 25 F.4th at 473.

Second, the ALJ considered the course of Amy's treatment from 2014 to 2019. This is an accepted consideration under the Social Security regulations. 20 C.F.R. § 404.1529(c); *see also Prill v. Kijakazi*, 23 F.4th 738, 749 (7th Cir. 2022) ("An ALJ is entitled to consider the course of a claimant's treatment."); *Deborah M. v. Saul*, 994 F.3d 785, 790 (7th Cir. 2021) ("The regulations on point also contemplate that an ALJ will consider a claimant's treatment history."). As the ALJ stated, the medical record demonstrated "negative imaging and laboratory finding as well as stable

and generally unremarkable clinical abnormalities on examination." (R. 1406-07). The ALJ recognized that Amy "sought extensive evaluation including invasive maneuvers[,]" but those procedures did not identify her abdominal pain. *Id*. at 1407-08. The ALJ concluded, "there is no definitive evidence of a level of anatomical deformity or pathophysiology to support the severity of the claimant's alleged limitations." The ALJ described Amy's treatment for her musculoskeletal complaints, including opioid therapy, minimally invasive injections, and nerve blocks. *Id*. at 1412; *Prill*, 23 F.4th at 749 ("treatment—injections, orthotics, and physical therapy— was conservative."); *cf. Schomas v. Colvin*, 732 F.3d 702, 709 (7th Cir. 2013) (narcotic pain relievers, steroid injections, and major surgery "belie the ALJ's conclusion that [claimant] was treated conservatively."). The ALJ opined that the evidence suggests Amy "underreports the effectiveness of her treatment, overemphasizes her degree of pain or is simply not as limited as she claims." (R. 1414).[6] Ultimately, the ALJ considered relevant records discussing Amy's treatment, appropriately compared and contrasted them, and thus, under these circumstances, the ALJ's credibility determination cannot rise to the level of being patently wrong.

Additionally, Amy takes issue with the ALJ's analysis of her history of hospitalizations. Amy argues that the ALJ's analysis of her abdominal pain and associated symptoms warranting emergent treatment totaling at least 42 hospitalizations was perfunctory. Doc. 19 at 5, 10, 15, 25 (citations omitted); Doc. 30 at 3, 5, 7-8. However, throughout the ALJ's opinion, she analyzed Amy's hospitalizations and emergency room visits in the context of her chronic pain. *Id.* at 1405, 1408-12, 1417.[7] Specifically, the ALJ identified the frequency of Amy's emergency room visits

---

[6] The ALJ provided accommodations due to the potential side effects of Amy's pain medication, such as limiting "the claimant to never working and occasionally working in vibration, with moving mechanical parts and operating a motor vehicle." (R. 1415).

[7] The ALJ also considered emergency room treatment from early and mid-2014, prior to Amy's alleged onset date of October 16, 2014. (R. 1405) (citations omitted).

in 2016 (eleven occasions), 2017 (five occasions), 2018 (two occasions), and 2019 (four occasions). *Id*. at 1411-12. The ALJ also discussed Amy's testimony regarding her emergent treatment in 2017 and 2020. *Id*. at 1403. Amy testified that she typically received IV hydration, Zofran, and pain management; she was usually sent home, but sometimes stayed overnight if her pain did not subside; and stress exacerbated her abdominal pain and sometimes contributed to her need to seek emergent treatment. *Id*. at 1403, 1410. Notably, the ALJ found that "[a]lthough the claimant was at times admitted for observation and testing, the claimant's typically received course involved IV hydration and opioid medication for pain control and then discharged." *Id*. at 1409. The ALJ concluded she did "not find the sheer number of emergency room visits dispositive of the claimant's disability in light of relatively minimal clinical findings and benign diagnostic workups." *Id*. Indeed, emergency room visits and hospitalizations alone do not establish disability. *See Engles v. Comm'r of Soc. Sec.*, 2010 WL 3715642, at *12 (S.D. Ill. Sept. 13, 2010) ("continued treatment is neither indicative nor dispositive of disability."); *see also Henderson v. Colvin*, 2014 WL 1316835, at *6 (N.D. Ind. Mar. 31, 2014) ("treatment alone does not establish disability"). Because Amy's numerous visits were a consideration the ALJ took into account, the Court finds that the ALJ sufficiently confronted the pertinent evidence.

Third, the ALJ acknowledged that Amy's drug-seeking behavior contributed to her need for emergent treatment. (R. 1410). An ALJ may consider drug-seeking behavior when the evidence supports it, as it may suggest a secondary motive for reported pain levels. *Elder v. Berryhill*, 774 F. App'x 980, 983 (7th Cir. 2019) ("inconsistencies between [claimant's] testimony and the record evidence—including his drug use, . . . and drug-seeking behavior—substantially support the ALJ's finding"); *Rasmussen v. Astrue*, 254 F. App'x 542, 546–47 (7th Cir. 2007) ("The record also supports the ALJ's finding that [claimant's] numerous emergency-room visits were

motivated more by her desire to acquire Vicodin than by injury or pain."). Here, the ALJ described a January 2015 emergency room discharge summary that stated, "it has been brought up in the past and I want to reiterate possibility for drug seeking behavior in this patient." (R. 821). The ALJ also relied on a February 2015 record where Amy was advised to follow up with her doctors and avoid the emergency room for chronic pain. *Id*. at 836. Additional records supporting drug-seeking included Dr. Chadha's 2015 report and Dr. Boll's progress notes in 2017 and 2018, which all noted Amy's narcotic dependence. *Id*. at 697, 699, 802, 804, 2006, 2011, 2014. Moreover, the ALJ pointed out that in 2017, Amy admitted to chewing on fentanyl patches. *Id*. at 2612. Eventually, the ALJ acknowledged that Amy initiated chemical dependence treatment in 2018, and her emergent treatment decreased as a result. *Id*. at 1411. The Court finds no patent error because the ALJ's opinion of drug-seeking behavior was supported by more than a mere scintilla of evidence.

Finally, the ALJ considered Plaintiff's ADLs. While the Seventh Circuit cautions against an ALJ equating a claimant's ability to perform ADLs with their ability to work full time, *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013), "an ALJ is not forbidden from considering statements about a claimant's daily life[,]" *Jeske v. Saul*, 955 F.3d 583, 592 (7th Cir. 2020) (citing 20 C.F.R. § 404.1529(a), (c)(3)); *see also Bruno v. Saul*, 817 F. App'x 238, 242–43 (7th Cir. 2020) (affirming where ALJ considered part-time employment in credibility determination). There is no evidence that the ALJ overstated Amy's ability to perform ADLs, nor did the ALJ infer from those activities an ability to perform full-time work. *See Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016) (noting that the ALJ discussed the claimant's performance of ADLs but did not equate it with an ability to work). Instead, the ALJ explained why Amy's ADLs undermined her subjective complaints and were inconsistent with other evidence in the record. In partially discounting Amy's subjective statements, the ALJ found them inconsistent with records showing Amy attended a

Blackhawks game, worked as a "flex" nurse at a hospital, tried to be more active, walked for exercise, prepared for and attended a trip to Banff with her brother's family,[8] went back to school to study to be a zoologist, enjoyed college, took a fitness class to get an extra credit and exercise, and planned to take bird classes in November of 2019. (R. 1413-14). Amy's testimony also stated that she traveled to a second home in Florida. *Id.* at 1456. Although the ALJ did not mention that Amy took time off school due to stomach problems, the ALJ considered Amy's various other ADLs in light of her description of her mental and physical limitations. Given the vast number of ADLs Amy reported, the ALJ had substantial evidence that suggested she could complete sedentary work. Accordingly, the ALJ's subjective symptom analysis was not patently wrong.

### C. Evaluation of Medical Opinion Evidence

Amy next contends that the ALJ's opinion analysis is flawed because the ALJ assigned little weight to Dr. Robert Boll's opinions (Amy's primary care physician), little weight to Dr. Rick Chadha's opinions (a gastroenterologist), and some weight to the state agency reviewers' assessments. In short, Amy disagrees with the ALJ's rationale in assessing the doctor's opinions, states that the ALJ rejected all of the opinion evidence, and concludes that the ALJ created an "evidentiary gap." Doc. 19 at 24-29. For the reasons discussed below, the Court disagrees.

#### i. Treating Physicians

With respect to applications filed before March 27, 2017, as long as a treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with other substantial evidence" in the case record, the ALJ should give it controlling weight. SSR. 96–2p; *see also Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008).

---

[8] Amy testified that she stayed in her room, laid in bed, and spent time with her brother's children during the trip. (R. 1456). Unlike in *Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014), this trip (and the second vacation to Florida) are not the only ADLs the ALJ relied on in her analysis.

14

However, an "ALJ need not blindly accept a treating physician's opinion." *Schreiber v. Colvin*, 519 F. App'x 951, 958 (7th Cir. 2013). An ALJ "may discount a treating physician's medical opinion if the opinion is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as [s]he minimally articulates [her] reasons for crediting or rejecting evidence of disability." *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) (internal quotations marks and citation omitted). While the ALJ should consider the regulatory factors that go into the weighing of medical opinions—(1) length of the treatment relationship and frequency of examination; (2) nature and extent of the treatment relationship; (3) supportability of the opinion with relevant evidence; (4) consistency with the record as a whole; (5) specialization—the ALJ does not have to recite them chapter and verse. 20 C.F.R. § 404.1527(c)(2)-(5); *see, e.g., Ray v. Saul*, 861 F. App'x 102, 105 (7th Cir. 2021) ("we will not vacate or reverse an ALJ's decision based solely on a failure to expressly list every checklist factor"). The ALJ need only minimally articulate her reasons for rejecting a medical opinion. *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008).

Beginning with Dr. Boll, he provided opinions in two letters from February 24, 2015 and July 22, 2015, and three questionaries dated May 12, 2016, May 18, 2017, and February 10, 2020. (R. 1416-18) (citing R. 717, 1091, 1299-1306, 1331-37, 2607-11). The ALJ articulated four reasons for assigning less than controlling weight to his various opinions. First, the ALJ acknowledged that Dr. Boll is Amy's examining primary care physician. *Id.* at 1416. However, an ALJ may discount the opinion of a treating physician who is not a specialist. *See Wright v. Kijakazi*, 2021 WL 3832347, at *6 (7th Cir. Aug. 27, 2021) (Section 404.1527(c)(5) "instructs an ALJ to generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty.") (quotations omitted). Here, the ALJ discounted Dr. Boll's

opinions because, as an internist, Dr. Boll did not specialize in gastrointestinal or psychiatric issues, including chronic visceral pain from gastritis. (R. 1416, 1418). For example, in a 2018 medical record, Dr. Boll stated, "I am not familiar with chronic visceral pain from gastritis[.]" *Id.* at 2011. Thus, the ALJ's reliance on Dr. Boll's lack of specialization was sufficient.

Second, the ALJ reasonably found that Dr. Boll's opinions were inconsistent with the evidence in the case record. An ALJ is entitled to reject a medical opinion where it is conclusory, unsupported, or contradicted by treatment records. *Pate v. Kijakazi*, 2021 WL 3627118, at *3 (7th Cir. 2021); *see also Pavlicek v. Saul*, 994 F.3d 777, 781 (7th Cir. 2021) ("ALJ may decline to give a treating physician's opinion controlling weight when the opinion is inconsistent with the physician's treatment notes."); *Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019) (ALJ properly discounted opinions based largely on subjective reporting). Here, the record indicated minimal abdominal findings in hospital records that Dr. Boll was copied on, a letter sent to Dr. Boll from 2015 explaining that all of Amy's visits "have shown normal amylase, lipase, and liver enzymes. . . I have explained a condition called sphincter of Oddi dysfunction type 3 no longer exists," and additional outpatient records. *See, e.g.*, (R. 663, 693, 718-20, 828, 916). In addition, the ALJ assigned the questionaries that Dr. Boll completed little weight because his own treatment records stated that he doubted that sphincter of Oddi dysfunction was the source of her ongoing pain, his treatment notes generally omitted documentation of abdominal examinations,[9] and his

---

[9] Plaintiff relies on *Herrmann v. Colvin*, 772 F.3d 1110, 1111 (7th Cir. 2014), to claim that the ALJ improperly rejected Dr. Boll's opinions because his treatment notes omitted certain documentation. There, the court explained that the ALJ could not disregard a treating physician solely because he lacked detailed notes to support his opinion. *Id.* However, in this case, the ALJ provided numerous reasons for assigning Dr. Boll's opinion little weight, only one of which was due to a lack of abdominal examinations in his notes. (R. 1418). This omission concerns the absence of specific examination by Dr. Boll, not the ALJ's finding that Dr. Boll's treatment notes per se lacked detail. *See Pavlicek v. Saul*, 994 F.3d 777, 781 (7th Cir. 2021) ("An ALJ may decline to give a treating physician's opinion controlling weight when the opinion is inconsistent with the physician's treatment notes.").

opinion was not consistent with nor supported by objective evidence demonstrating minimal abdominal findings, preserved motor, musculoskeletal, neurologic, and cognitive functioning. *Id.* at 1418 (citations omitted). As such, the ALJ identified specific inconsistencies between Amy's medical record and Dr. Boll's opinions.

Third, the ALJ concluded that Dr. Boll overly relied on Amy's subjective complaints and reports of chronic pain. (R. 1416-18). An ALJ may discount a treating physician's opinions based on the claimant's subjective complaints. *See Bates v. Colvin*, 736 F.3d 1093, 1100 (7th Cir. 2013) ("[W]here a treating physician's opinion is based on the claimant's subjective complaints, the ALJ may discount it."); *see also* 42 U.S.C. § 423(d)(5)(A) (a claimant's assertions of pain, taken alone, are not conclusive of disability). Here, the ALJ found that Dr. Boll's opinions were not consistent with records where Amy denied weakness, numbness, neck or back pain; her mental status was appropriate; she had no motor or sensory deficits; and she did not suffer from ataxia.[10] R. 1417-18 (citing R. 685, 689, 788, 815, 829). In response to the July 22, 2015 letter, the ALJ explained that due to medical evidence of opioid dependence and Amy's multifactorial abdominal pain, the frequency of her subjective abdominal pain was not dispositive of disability. *Id.* Therefore, the ALJ explained how the cited evidence regarding Amy's subjective symptoms led to her conclusion.

Fourth, Dr. Boll's conclusions regarding Amy's ability to work reflected final determinations of disability rather than objective medical evaluations. An ALJ may discount a doctor's opinion, where it is a conclusion reserved for a final disability determination. *See Ray*, 861 F. App'x at 106 (holding the treating physician's "conclusions reflected final determinations

---

[10] Ataxia is "a lack of muscle control during voluntary movements, such as walking or picking up objects." *Singh v. Colvin*, 2014 WL 2777144, at *4 n.4 (S.D. Ill. June 19, 2014) (citing http://www.mayoclinic.org/diseases-conditions/ataxia/basics/definition/con-20030428).

of disability rather than objective medical evaluations—and therefore were entitled to no weight."); *Loveless*, 810 F.3d at 507 ("Omitted from this definition [of medical opinions under 20 C.F.R. § 404.1527] are opinions about a claimant's ability to work, a question the regulation reserves for the Commissioner."). In particular, the ALJ considered the February 24, 2015 letter, which included Dr. Boll's opinion concerning Amy's ability to work part-time with the goal of returning to full-time work. (R. 1417) (citing R. 717). The ALJ found that the letter did not address the entire period at issue, did not offer work-related functional limitations, and the conclusory statements were reserved for the commissioner. *Id*. Here, the ALJ did not have to accept Dr. Boll's opinion that Amy could only work part-time. The ALJ needed only to weigh Dr. Boll's assessments about the nature and severity of Amy's impairments, which she did. As already discussed, the ALJ summarized and evaluated the treatment notes and opinions of Dr. Boll, as well as Amy's testimony, as relevant evidence. *See infra* at 15-17. Thus, Dr. Boll's opinion was not entitled to controlling weight and was sufficiently considered by the ALJ.

Turning to Dr. Chadha, he completed a questionnaire dated May 16, 2017. (R. 1316-19). The ALJ assigned the opinion little weight for three reasons that the Court finds persuasive.[11] *Id*. at 1418-19. First, the ALJ explained that portions of the opinion were unrelated to Dr. Chadha's gastroenterologist specialty. *Id*. at 1418. An ALJ may discount a treating physician's opinion when it is unrelated to their specialty. *See, e.g., Olivas v. Saul*, 799 F. App'x 389, 391 (7th Cir. 2019) (affirming where the doctor's opinion regarding claimant's "psychiatric symptoms addressed an impairment outside her family-medicine expertise"); 20 C.F.R. § 404.1527(c)(5)

---

[11] The ALJ also found that Dr. Chadha's opinion did not address the entire period at issue in assigning the opinion limited weight. R. 1418. This conclusion is permissible, *Stacy W. v. Kijakazi*, 2022 WL 991966, at *8 (N.D. Ill. Apr. 1, 2022) ("ALJ's explanation as to why their opinions were not relevant to the period at issue constituted substantial evidence"), but the Court does not find it persuasive because the ALJ did not develop her analysis.

("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty. . ."). Here, Dr. Chadha competed a questionnaire on May 16, 2017. (R. 1316-19). In response to a question that asked, "to what degree can you patient tolerate work stress," Dr. Chadha checked a box that said Amy is incapable of even low-stress work. *Id.* at 1318. According to the ALJ, low stress describes work related to psychiatry, not gastroenterology. *Id.* at 1418. The ALJ explained that Dr. Chadha's understanding of "low stress work" was open-ended. *Id.* There is a difference between opining on specific limitations due to gastrointestinal impairments (e.g., standing, lifting, reaching) and opining on the level of stress a claimant can tolerate in their work. Ultimately, the ALJ correctly discounted Dr. Chadha's opinion because he has specialized training in gastroenterology, not psychiatry, and this opinion regarding Amy's ability to tolerate work stress was unrelated to his medical specialty.

Second, the ALJ explained that Dr. Chadha has no training in the rules and definitions of Social Security disability. (R. 1418). Here, Dr. Chadha opined that Amy would be off task for 25% or more of a workday. *Id.* The ALJ explained that Dr. Chadha's understanding of off task is subject to his own interpretation because he has no training in social security regulations. *Id.* Pursuant to the Social Security regulations, the ALJ properly considered Dr. Chadha's lack of training in the regulations. *See* 20 C.F.R. § 404.1527(c)(6) ("we will also consider . . . the amount of understanding of our disability programs and their evidentiary requirements that a medical source has"); *see also Michelle D. v. Kijakazi*, 2022 WL 972280, at *3 (N.D. Ill. Mar. 31, 2022) (affirming where rheumatologist lacked specialized knowledge regarding the rules and definitions with respect to Social Security disability); *Depalma v. Colvin*, 2015 WL 7588547, at *1 (W.D. Wis. Nov. 25, 2015) (relying on the fact that the doctor did "not have expertise in social security disability law"). Instead, Plaintiff relies on *Samuel v. Berryhill*, 2018 WL 1706370, at *8 (N.D.

Ill. Apr. 9, 2018), where the court rejected the ALJ's explanation due to a concern that "[i]f an ALJ can reject a treating physician's opinion simply because a non-treating ... doctor is more familiar with the disability standards, then he would be granting favored status to the non-treating doctor which is unsupported by the regulations." (internal citations and quotations omitted). Given the ALJ's various reasons for discounting Dr. Chadha's opinion here, which did not prioritize a non-treating doctor, this case is inapplicable. As such, the ALJ sufficiently considered Dr. Chadha's opinion and discounted it because he lacked expertise in social security disability.

Third, the ALJ was permitted to find that Dr. Chadha's treatment records did not support his opinion. An ALJ may discount a medical opinion that is conclusory, unsupported, or contradicted by treatment records. *Pate*, 2021 WL 3627118, at *3; *see also Green v. Saul*, 781 F. App'x 522, 527 (7th Cir. 2019) ("An ALJ may discount a doctor's opinion for reasons that are supported by the record."). Here, the ALJ identified Dr. Chadha's clinical findings and other medical providers' observations documenting benign clinical and diagnostic findings. (R. 1418). The records the ALJ cited included Dr. Chadha's treatment notes, notes where other doctors suggested consulting Dr. Chadha, and additional medical records. *See, e.g.*, *id.* at 668, 685, 815, 2243-44, 2478-79, 2622, 2645. In these records, the ALJ pointed out that Amy had normal physical exams with no masses or tenderness, normal complete blood count and metabolic panels, improved pain with no relevant clinical findings, and benign abdomen findings. *Id.* Relatedly, the ALJ also identified the fact that Dr. Chadha failed to account for Amy's history of opioid dependence and did not mention his findings that by January 2019, Amy's abdominal pain was controlled with Tramadol once she was "off narcotics." *Id.* at 1418-19 (citing R. 2642). Thus, the ALJ adequately explained her conclusion that Dr. Chadha's opinion was unsupported and contradicted by other records.

Because the ALJ determined that the treating physician's opinions do not have controlling weight, the Court must determine whether the ALJ adequately considered the checklist factors. 20 CFR 404.1527(c). In doing so, the Court applies a common-sense reading to the entirety of an ALJ's decision. *Rice*, 384 F.3d at 369; *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). The Seventh Circuit has said it will not vacate or reverse solely on a failure to list every checklist factor. *See, e.g.*, *Ray*, 861 F. App'x at 105. Here, the ALJ's decision conveys how closely she considered both doctors' opinions within the context of their treatment relationship and the consistency and supportability of their opinions.

Regarding Dr. Boll, the ALJ discussed Amy's treatment records from 2015 to 2018, noted that Dr. Boll was only an internist, explained that Dr. Boll doubted the source of Amy's ongoing pain, stated that his records lacked abdominal examinations, and concluded that Dr. Boll's opinions were not consistent with or supported by the medical record. (R. 1416-18). While the ALJ did not mention the length of Dr. Boll's treatment relationship, the frequency of examinations, and the tests he performed in the section analyzing Dr. Boll's opinions, the Court reads the ALJ's opinion as a whole. *Rice*, 384 F.3d at 370 n. 5. In doing so, the record shows that Amy had a long treatment relationship with Dr. Boll, and the various citations to medical records demonstrate the frequency of treatment and any tests that Dr. Boll performed or referrals he provided during Amy's examinations. Concerning Dr. Chadha, the ALJ opined that he was Amy's treating physician with a longitudinal treating relationship, specialized as a gastroenterologist, detailed his clinical findings and observations, and concluded that Dr. Chadha's treatment records did not support his ultimate opinion. *Id*. at 1418-19. Although the ALJ did not explicitly mention the frequency of Dr. Chadha's examinations or the types of tests he performed, the record includes evidence of examinations and the procedures and tests that Dr. Chadha performed. Thus, this is far from a

21

case where the ALJ disregarded a treating physician's opinion without explanation or without examining any of the checklist factors. Instead, the ALJ adequately explained her reasoning, the minimal articulation of her reasoning is sufficient, and the record overall supports the ALJ's conclusion here with more than a mere scintilla of evidence.

### ii.    Agency Reviewers

Plaintiff next argues that the ALJ erred by affording some weight to the state agency reviewers, which was more than that given to Amy's treating physicians. Doc. 19 at 24. Amy also asserts that because their review was completed in early 2016, the reviewers failed to consider four more years of relevant medical treatment relevant. *Id.* The Court disagrees. An ALJ may give more weight to the state agency reviewer than a treating physician as long as the ALJ explains her rationale. *See, e.g.*, *Leffler v. Comm'r of Soc. Sec.*, 2016 WL 4074118, at *8 (C.D. Ill. July 29, 2016) (affirming where ALJ gave more weight to agency reviewer than treating physician). An ALJ may also discount agency reviewers' opinions where subsequent records exist that the reviewers could not consider. *See, e.g.*, *Lewis v. Acting Comm'r of Soc. Sec.*, 2018 WL 4468973, at *3 (C.D. Ill. Sept. 18, 2018) ("ALJ gave only some weight to this opinion because there was subsequent documentation that [agency reviewer] did not consider."); *Stephanie N. v. Saul*, 2020 WL 6710421, at *9 (C.D. Ill. Nov. 16, 2020) ("The ALJ gave the state agency reviewers' opinions some weight, explaining that she had additional records . . . which led her to find that [claimant] had more restrictive exertional limitations than included in the state agency reviewers' opinions.").

Here, the ALJ explained that she assigned the agency reviewers' opinions some weight because they were highly trained and familiar with the rules and regulations of disability determinations. (R. 1416). The ALJ also stated that "their opinions may have been consistent with the evidence available at the time of their review; however, subsequently developed evidence since

reconsideration supports further restrictions." *Id*. (citations omitted). Throughout the ALJ's explanation, she described why she gave more weight to the agency reviewers than the treating physicians, and addressed the fact that additional evidence came in after the agency reviewers provided their opinions that warranted further restrictions. The ALJ pointed out that the state agency consultants generally opined that Amy was limited to light work with postural limitations, and her mental impairments were not severe. *Id*. Unlike the cases Amy relies on, the ALJ did not uncritically accept the agency reviewers' conclusions. *See* Doc. 30 at 3 (citations omitted). Although the state agency reviewers completed their review of the record in 2016, Dr. Boll provided additional opinions in 2017 and 2020, (R. 1331-37, 2607-11), and Dr. Chadha provided an updated opinion in 2017, id. at 1316-19. Simply because Drs. Boll and Chadha had additional evidence does not entitle their opinions to more weight. Rather, the ALJ considered other factors, including inconsistency with the case record or physician's own treatment records, lack of specialization, overreliance on subjective complaints, conclusions reserved for a final disability determination, and lack of training in the rules and definitions of disability. *See infra* at 14-21. Thus, the Court finds no fault with the ALJ's weighing of the agency reviewers' conclusions, where other parts of the ALJ's decision (as discussed herein) show that the ALJ built a logical bridge between the evidence of record and her conclusions about the weight to be given the various medical opinions and the extent of Amy's limitations as supported by the record evidence. *See Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013) ("ALJ must build an accurate and logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence").

In addition, it is well established that arguments are waived if not raised and developed in the opening brief. *Martin v. Kijakazi*, 2022 WL 1681656, at *3 (7th Cir. 2022) ("[Claimant] waived

this argument by failing to raise it in his opening brief."); *Brown v. Colvin*, 661 F. App'x 894, 895 (7th Cir. 2016) (holding claimant waived "arguments by not developing them and by raising them for the first time only in his reply brief"). It is not enough for a claimant to "mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." *White v. United States*, 8 F.4th 547, 552–53 (7th Cir. 2021) (citations omitted) (quotations omitted). In the present case, Amy did not include *any* argument in her opening brief requesting an updated medical opinion or state agency review. *See generally* Doc. 19. As a result, Amy waived this argument by failing to raise it in her opening and reply brief. Therefore, the Court need not address this issue any further.

Moreover, Plaintiff cherry-picks the record to dispute the ALJ's characterization of the agency medical opinions and asserts that the ALJ's rejection of the medical opinion created an evidentiary gap that rendered the ALJ's RFC finding unsupported by substantial evidence. *See, e.g.*, Doc. 19 at 27. However, while the ALJ assigned little weight to Dr. Boll's and Dr. Chadha's opinions and some weight to the agency reviewers' assessments, (R. 1416-19), "a finding that a treating source's medical opinion is not entitled to controlling weight does not mean the opinion is rejected." SSR 96–2p. Rather, "[i]t may still be entitled to deference." *Id*. Dr. Boll's and Dr. Chadha's opinions were not rejected—they were just given little weight. And the ALJ gave some weight to the agency reviewers' opinions. Thus, there was no evidentiary gap because the ALJ had medical opinions in the record, properly considered those opinions, explained her assignment of weight, and used them accordingly to create the RFC. In essence, Plaintiff's argument is little more than a disagreement with the weight the ALJ gave the treating physician's and agency reviewers' opinions and the medical evidence that contradicted the opinions. However, it is not the task of the Court to reweigh the evidence. *Wagner v. Berryhill*, 920 F.3d

1146, 1152 (7th Cir. 2019); *see also Reynolds*, 25 F.4th at 473 (the Court "will not reweigh the evidence ... or substitute [its] judgment for the ALJ's determination.").

Further, courts have affirmed an ALJ's RFC determination where the ALJ assigns the state agency reviewers some weight, and then the ALJ provides more restrictive limitations in the final RFC than the limitations the physicians or reviewers suggested. *See, e.g.*, *Stephanie N.*, 2020 WL 6710421, at *9 ("The ALJ gave the state agency reviewers' opinions some weight, explaining that she had additional records . . . which led her to find that [claimant] had more restrictive exertional limitations than included in the state agency reviewers' opinions."); *Irons v. Astrue*, 2013 WL 718464, at *7 (N.D. Ind. Feb. 27, 2013) (affirming where ALJ gave the treating physicians, medical experts, and state agency reviewers some weight and "found that Plaintiff was much more significantly limited when determining his RFC.").[12] The ALJ reviewed the agency reviewers' opinions here, but concluded that Amy should have more restrictive limitations. *Compare* (R. 1416) (agency reviewers limited Amy to light work with postural limitations and found that her mental impairments were not severe), *with id*. at 1402 (ALJ limited Amy to sedentary work with postural limitations and simple work-related decisions). The ALJ devoted over seventeen pages of her opinion to explain how the RFC she drafted limiting Amy to sedentary work with specific limitations accounted for Amy's impairments. (R. 1402-19).[13] In short, the ALJ's RFC

---

[12] Plaintiff relies on *Barbarigos v. Berryhill*, 2019 WL 109373 (N.D. Ill. Jan. 4, 2019), to assert that no medical assessment supports a finding that Amy can perform the physical or mental requirements in her RFC. Doc. 19 at 28. There, the court remanded, in part, because the court agreed with the agency consultants that there was insufficient medical evidence in the record to assess the plaintiff's physical limitations because plaintiff failed to attend two scheduled consultative examination appointments. *Id.* at *3, 12. On the contrary, as explained throughout this opinion, there are sufficient medical records to support the ALJ's RFC limitations and accommodations, including various consultative examinations that Amy attended and additional medical evidence from Amy's treating physicians.

[13] In addition, Amy has not identified any limitations that the ALJ omitted. *See Dudley v. Berryhill*, 773 Fed. App'x. 838, 842 (7th Cir. 2019) ("Critically, [claimant] did not identify any limitations that the ALJ omitted and should have included.").

was supported by much more than a scintilla of evidence.

### D.  Step Five

Lastly, Amy argues that the ALJ erred at step five.  The Court disagrees.  At step five, the burden shifts from the claimant to the ALJ.  The ALJ must demonstrate that there are significant jobs in the national economy for someone with the claimant's abilities and limitations.  *See* 20 C.F.R. § 404.1560(c)(2).  Often, the ALJ will rely on the testimony of a VE for those estimated job numbers.  The VE's job estimates must be the product of a reliable methodology, *Brace v. Saul*, 970 F.3d 818, 821-22 (7th Cir. 2020), meaning they are based on "well-accepted" sources, and the VE explains her methodology "cogently and thoroughly." *Biestek*, 139 S. Ct. at 1155; *see also Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002) (If the basis of the VE's conclusions is questioned at the hearing, "then the ALJ should make an inquiry (similar though not necessarily identical to that of Rule 702) to find out whether the purported expert's conclusions are reliable.").

At the hearing, the ALJ heard testimony from VE Michelle Peters-Pagella, who testified that given Amy's age, education, work experience, and RFC, a sufficient number of jobs existed in the national economy.  Specifically, three jobs were available: sorter (21,000 jobs nationally), bench packer (18,000 jobs nationally), and inspector (20,000 jobs nationally), for a total of 59,000 jobs. (R. 1461-62).  The VE explained how she used her experience, 25 years in the field, and underlying labor data from SkillTRAN's OccuBrowse database and the Occupational Employment Survey to estimate the number of jobs. *Id*. at 1460-74.  Plaintiff's attorney then questioned the VE regarding her analysis of the available jobs and underlying data. *Id*. at 1463-67, 1469-73.  After the hearing, Plaintiff's attorney submitted two post-hearing objections asserting that the VE did not provide reliable testimony. *Id*. at 1801-38.  The ALJ overruled Plaintiff's objections and found the VE reliable because of the VE's professional knowledge and experience in job placement, her

education and experience, the absence of any reviewing tribunal that has found the VE or her methodology to be wanting, and her testimony concerning the data from OccuBrowser Pro 2019 and the process she uses to minimize over inclusive jobs. *Id.* at 1421-22.

First, Plaintiff's attorney claims there is a conflict between the skill level of the jobs the VE provided and his own analysis of the jobs on O*Net. However, Plaintiff presents no authority that a VE's testimony is unreliable if it is inconsistent with data in O*Net. Plaintiff also does not explain what O*Net is or why the Court should find it more reliable than the combination of the VE's expertise and data from SkillTRAN. Courts in this circuit have upheld the VE's use of SkillTRAN and the ALJ's reliance on the numbers produced by it. *See, e.g.*, *Michelle S. v. Kijakazi*, 2022 WL 4551967, at *6 (N.D. Ill. Sept. 29, 2022) (affirming where the VE relied on OccuBrowse and SkillTRAN); *Dunn v. Kijakazi*, 2021 WL 5105169, at *12 (E.D. Wis. 2021) (citing *Bruno*, 817 Fed. App'x. at 243 (affirming where the VE "testified that his estimate was based on what he called the 'SkillTRAN approach'"); *Blankenship v. Colvin*, 2017 WL 2805883, at *4 (N.D. Ind. June 29, 2017) ("Plaintiff has not shown a legal requirement that the ALJ, or the VE, explain the methodology used by Skilltran[.]"). Here, the VE used SkillTRAN, an approved methodology, to identify three jobs available in the national economy. The VE also sufficiently explained her use of SkillTRAN and OccuBrowse at the hearing. *See infra* at 26. Thus, the Court is not convinced by Plaintiff's argument that we should remand because Plaintiff's analysis of the job data deserves more weight than that of the VE, an expert in her field.

Second, Amy claims the ALJ did not allow meaningful cross-examination of the VE's methodology. However, this is not a case where Plaintiff's attorney asked the VE no questions or was stopped by the ALJ. Instead, Plaintiff's attorney spent nearly ten pages of the transcript asking the VE to describe her process for determining the number of jobs available in the national

economy and the underlying data. (R. 1463-67, 1469-73). For example, Plaintiff's attorney asked if the VE went through the sedentary jobs and confirmed they still exist, and the VE answered that she relied on data from 2019 and could compare it to the DOT codes. *Id*. at 1467. When the ALJ noticed that Plaintiff's attorney repeated similar questions concerning the VE's reliability, she interjected the following: "I think what she's saying is it's based on the underlying data that they've put in there with the OES surveys, the BLS data. I mean I don't know what more she can say at this point." *Id*. at 1471 (cleaned up). Cross-examination continued for over two more pages. *Id*. at 1471-73. The VE's testimony describing the process by which she arrived at her job numbers was "cogent and thorough," *Biestek*, 139 S. Ct. at 1155, particularly in response to the ALJ's questions ensuring that the VE confirmed the underlying data was checked against the requirements of the DOT codes to match the hypotheticals. (R. 1468-69). The ALJ also verified that the VE reviewed the non-exertional job descriptions to understand their requirements. *Id*. at 1469. Indeed, the VE identified the source of her job estimates, detailed the underlying data, and answered additional questions throughout cross-examination. Ultimately, Plaintiff had ample opportunity for cross-examination. Unlike the recent precedent in *Ruenger v. Kijakazi*, 23 F.4th 760, 762 (7th Cir. 2022), the ALJ ensured the VE's job estimate was the product of a reliable methodology by eliciting testimony during her hearing, allowing detailed cross-examination, and addressing Plaintiff's post-hearing objections. The VE's testimony provided the ALJ with "sufficient confidence that her methodology was reliable." *Id*. at 763. As such, the VE's reliance on her education and experience in the field, the Occupational Employment Survey, and OccuBrowse and SkillTRAN constitutes "more than a mere scintilla," *Biestek*, 139 S. Ct. at 1154, and provides an adequate foundation for the VE's estimates.

In sum, the ALJ's step three equivalency for Listing 5.06 contained no errors. The ALJ

also properly evaluated Plaintiff's subjective symptoms as required by the social security regulations. Moreover, the ALJ provided an accurate and logical bridge between the evidence and her conclusions in affording little weight to Drs. Boll and Chadha and some weight to the agency reviewers. Further, the ALJ's step five analysis contained no errors, and the ALJ allowed for meaningful cross-examination. Accordingly, reversal and remand is not warranted.

## CONCLUSION

For the reasons stated above, Plaintiff's request for reversal of the ALJ's decision is denied [19], the Acting Commissioner's Motion for Summary Judgment [27] is granted, and the ALJ's decision is affirmed. The Clerk is directed to enter judgment in favor of the Acting Commissioner and against Plaintiff.

**SO ORDERED.**

Dated: February 27, 2023

_____

Sunil R. Harjani
United States Magistrate Judge